(C.D. 2757)

BORDER BROKERAGE COMPANY *v.* UNITED STATES

United States Customs Court, First Division

(Decided September 8, 1966)

*Lawrence & Tuttle (George R. Tuttle* of counsel) for the plaintiff.
*John W. Douglas*, Assistant Attorney General *(Glenn E. Harris* and *S. William Barr*, trial attorneys), for the defendant.

Before OLIVER and NICHOLS, Judges, and WILSON, Senior Judge;
NICHOLS, J., concurring

WILSON, Senior Judge: The merchandise involved in this protest is covered by two entries and consists of certain fish described on the invoices as frozen true cod blocks, exported by British Columbia Packers, Ltd., Vancouver, Canada. The importation covered by entry No. 05-6912 was entered at Seattle, Wash., on June 5, 1959, and that covered by entry No. 05-7403 was entered at Los Angeles, Calif., on June 30, 1959. The imported fish was classified under paragraph 717(b) of the Tariff Act of 1930, as modified, as "Fish, fresh or frozen, boned, divided into portions, filleted, sliced, or skinned, nspf," and assessed with duty at 2½ cents per pound.

The plaintiff claims that the imported merchandise is similar in all material respects to the fish blocks involved in the case of *The Lee Herrmann Co., a/c The Coldwater Seafood Corp.* v. *United States*, 43 Cust. Ct. 49, C.D. 2101, the record in which was incorporated in the present proceedings. In *The Lee Herrmann* case, *supra*, the involved merchandise consisted of certain haddock blocks and cod blocks. The record disclosed that the fish blocks there in question, unlike fillets of frozen and fresh fish, were not composed of whole pieces of fish but comprised various pieces of fish together with bits of trimmings in block form and that they were not sold for direct consumption as imported but were only used for further processing into fish sticks or fish portions. The court therein held the merchandise not dutiable under paragraph 717(b) of the tariff act as fish "filleted," "skinned," "boned," "sliced," or "divided into portions," as classified, but that the merchandise was properly dutiable under paragraph 720(b) of the Tariff Act of 1930, as modified, at the rate of 1 cent per pound, as "Fish, prepared or preserved, not specially provided for: * * * In bulk or in immediate containers, weighing with their contents more than fifteen pounds each," as claimed. It is, therefore, contended that the importation is dutiable at the rate of 1 cent per pound only under paragraph 720(b) of the Tariff Act of 1930, as modified by the General Agreement on Tariffs and Trade, T.D. 51802, as "Fish, prepared or preserved, not specially provided for: * * * In bulk or in immediate containers, weighing with their contents more than fifteen pounds each."

Plaintiff first raised the question of quota but during the proceedings abandoned that claim. Under the original protest, no specific claim was made under paragraph 720(b). However, counsel for

plaintiff was permitted to amend the protest so as to claim the imported fish classifiable at 1 cent per pound under paragraph 720(b), as modified, *supra*.

It is conceded by the Government that the plaintiff's proof is sufficient to establish that the merchandise covered by entry No. 05–6912 is controlled by *The Lee Herrmann* case, *supra*. The only issue left for determination is, therefore, whether the imported merchandise entered at Los Angeles, entry No. 05–7403, is controlled by the incorporated case.

No witness was produced by the plaintiff who saw the imported fish at the port of Los Angeles nor was any witness produced who could identify the merchandise. The plaintiff relies upon the testimony of Donald Petrie, quality control manager for B.C. Packers, Ltd., who was formerly quality control supervisor of Imperial Cannery, a processing plant belonging to B.C. Packers and William D. Cameron, accountant at Seaport Fish Co., Inc., formerly accountant for the Ruppert Fish Co., doing business as Seaport Fish Co. in Seattle. Mr. Petrie testified that he had supervised the operations of B.C. Packers, Ltd., in 1959 when they produced certain preserved fish designated true cod blocks; that, from 1950 to 1962, he was supervisor of that company's operations as well as in charge of quality control. He described the process followed in the preparation of fish by the B.C. Packers, as follows:

Q. Now, would you describe the process of making the blocks?— A. The fish are filleted, skinned, boned, put into a form, pressed, frozen, and then put into paper bags. Also going into this form are cut pieces from the fillet wrapping line and trim pieces to a rate of 5 percent in our case.

Q. After they are placed into the form then what happens to them?—A. They are placed in the plate freezers and frozen under pressure to make a homogeneous mass. [R. 13.]

The witness further testified as follows:

Q. Now, what is the purpose of packing the fish bits and pieces in this manner?—A. This merchandise is used for either further processing or for use in the fish sticks or fish portions where the blocks are sawn into regular shapes. The pressure makes them homogeneous so that in the sawing processing they won't come apart.

Q. Is there any other commercial use that you know of?—A. No, just that. [R. 14.]

If the merchandise described by Mr. Petrie had been identified definitely as the merchandise entered at the port of Los Angeles under entry No. 05–7403, then it would appear to the court that the plaintiff would be entitled to prevail. However, the fact that such merchandise was packed in Canada is not sufficient to establish that it was the

same merchandise as that covered by this protest under entry No. 05–6912. The following testimony given by Mr. Petrie indicates the inadequacy of his testimony to identify the merchandise entered at Los Angeles:

JUDGE WILSON: Do you have any information concerning a shipment of such merchandise to the United States?

THE WITNESS: They are put up for resale.

JUDGE WILSON: I asked if you have personal knowledge of it?

THE WITNESS: Of this particular lot?

JUDGE WILSON: Or of any shipments made to the United States of this fish?

THE WITNESS: I know they are put up and they are sold into the states.

JUDGE WILSON: Were they packed for shipment to the United States?

THE WITNESS: Some are. Not the whole total production but some production is, yes. [R. 15.]

Q. Well, of the production that you supervise, Mr. Petrie, is part of that packing exported to the United States?—A. Yes.

Q. And who are the buyers to whom you export in the United States?—A. Seaport Fish.

Q. Seaport Fish. Where are they located?—A. In Seattle.

Q. And who else? To whom else did you ship in the states?—A. Fuller Brothers in Santa Rosa, and we also ship to our plant in Los Angeles.

Q. What is the name of your plant?—A. Certi-Fresh Seafoods.

\*　　\*　　\*　　\*　　\*　　\*　　\*

JUDGE WILSON: Where is the man that received this merchandise? Don't you have a witness who is familiar with the merchandise that was received here?

MR. TUTTLE: No, we don't.

JUDGE WILSON: Has he gone out of business or something?

MR. TUTTLE: Well, his business at this point has been—Two men are out and he has been pressed with his business operation. [R. 15–17.]

Later, counsel for the plaintiff called another witness, Walter B. Soroe, but he knew nothing about any fish shipped to Los Angeles. He helped identify the entry of merchandise made in Seattle only. The plaintiff also called as a witness, William D. Cameron, accountant at Seaport Fish Co., Inc., successor to Ruppert Fish Co. in Seattle, Wash., where the witness also served as an accountant. Mr. Cameron's employer was a wholly owned subsidary of B.C. Packers, Ltd., in Canada. Mr. Cameron was able to give some testimony con-

cerning the Seattle entries, but his testimony added nothing to the identification or description of the fish entered in Los Angeles.

Toward the end of the proceedings in Seattle, counsel for the plaintiff asked that the case be transferred to the port of Los Angeles for further trial. As grounds for the transfer, plaintiff's counsel argues as follows:

MR. TUTTLE: Well, I would ask for that purpose, or for the purpose of securing a witness from the purchaser in Los Angeles of the second entry, there being two entries, the case be transferred to the current Los Angeles docket with the understanding that it will be submitted at this term, Your Honor. [R. 42.]

Over the objection of Government counsel, the case was ordered transferred to Los Angeles.

When the case was called for trial at that port, no further witnesses were called. Counsel for plaintiff merely moved for the incorporation of the record in *The Lee Herrmann* case, *supra*, which was granted, and then rested.

If plaintiff is to prevail in this case with respect to the merchandise covered by entry No. 05–7403, it will have to be upon the theory that some fish blocks similar in all respects to the merchandise involved in *The Lee Herrmann* case, *supra*, were manufactured in Canada and shipped to the United States. Plaintiff in the case at bar has the burden of establishing that the merchandise in question described on the invoice as "FROZEN CANADIAN FISH True Cod Cut Blocks" actually consisted of fish, prepared or preserved, not specially provided for, in bulk or in immediate containers weighing with their contents more than 15 pounds each and that this merchandise delivered at Los Angeles was that covered by entry No. 05–7403 herein. In our opinion, the evidence in this record fails to establish these facts. Accordingly, plaintiff in this case has failed to overcome the presumption of correctness attaching to the classification of the merchandise covered by entry No. 05–7403 under paragraph 717(b) of the tariff act as "Fish, fresh or frozen (* * *), filleted, skinned, boned, sliced, or divided into portions, not specially provided for."

The issue really simmers down to the question of whether the invoice statement shown on the official papers in evidence is enough to establish that the imported fish covered by entry No. 05–7403 is in fact true frozen cod blocks. In other words, are the statements on the invoices alone sufficient to overcome the presumption of correctness of the collector's classification? This point has been decided against the plaintiff's position in the case of *Oakland Food Products Co. et al.* v. *United States*, 32 CCPA 28, C.A.D. 281, and *United States* v. *Ocean Brokerage Co.*, 11 Ct. Cust. Appls. 38, T.D. 38648. The court held against the claim that an invoice description is sufficient to over-

come the presumption of correctness attaching to the collector's classification. In the *Oakland Products* case, *supra*, the law was stated as follows:

The invoice description does not fix in a dutiable sense the nature or status of an importation. It is but one of the items considered by the collector when he makes his classification of imported merchandise. It is difficult to understand what value there would be to the presumption of correctness attaching to his action in classifying if such were not the case, and all an importer would have to do would be to introduce his invoice as establishing a *prima facie* case and pass the burden to the Government to establish the correctness of the classification.

On the record as presented, the court is of the opinion that the evidence presented by the plaintiff in the instant case is not sufficient to overcome the presumption of correctness of the collector's classification in entry No. 05–7403 and is not sufficient to prove that the merchandise entered at Los Angeles is in all material respects similar to the merchandise in *The Lee Herrmann* case, *supra*.

The protest is sustained as to the merchandise entered at Seattle, Wash., and covered by entry No. 05–6912, and overruled as to the merchandise covered by entry No. 05–7403.

Judgment will be entered accordingly.

### CONCURRING OPINION

NICHOLS, Judge: Judge Wilson, as hearing judge, stated what evidence he wanted to establish that the merchandise imported under entry 05–7403 was the merchandise whose production Mr. Petrie of British Columbia Packers, Ltd., described to the court. He repeatedly called on counsel for plaintiff to produce witnesses concerned with the importation. Counsel seemingly acquiesced in this demand and moved for transfer of the case to Los Angeles so that the Los Angeles consignee could testify. But he rested when the case was called there without producing any further witness. Under the circumstances, it would be a travesty now to hold that the identity of the Los Angeles merchandise was proved.

The official papers show that British Columbia Packers, Ltd., was the exporter. (Although matter in such papers do not refute the collector's findings when inconsistent, when not inconsistent they do establish *prima facie* the truth of what they disclose.) Mr. Petrie, however, had responsibilities in that company only with respect to production, not selling, shipping, or exporting. The right official of the exporter could have closed the evidentiary gap just as well as the importer. The papers do not show that British Columbia Packers, Ltd., produced the imported merchandise; they could have obtained it from another vendor. Mr. Petrie said the type of cod block he described was the only type his company produced and the only type

it shipped to United States consignees (R. 15, 16). But he admitted his company also produced fish fillets and shipped them to the United States (R. 17). The notations on the invoice indicate that the advisory classification, which the collector adopted, was "Fillets." Read this with *The Lee Herrmann Co. et al.* v. *United States*, 43 Cust. Ct. 49, C.D. 2101, the incorporated case, and it is clear he was rejecting, not supplementing, the invoice description: if "Fillets," the merchandise could not be "cod blocks" in tariff terminology. Proof by an exporter's official, therefore, to be sufficient, would have had to show that this particular shipment was cod blocks, not fillets. Evidence that the exporter produced a certain type of cod block and shipped no other type of cod block to the United States was not enough. One must assume the actual words used were chosen with care. I am impelled to record these remarks through fear that the case may be taken as a precedent for restricting the source of testimony to prove the identity of merchandise in litigation, to a degree I would think excessive. For myself, I would accept such proof of any nature that reasonably satisfied my mind, including proof from exporter sources. The division is, of course, unanimous that necessary proof cannot be supplied from the official papers as to matters wherein the collector's findings were in conflict.

(C.D. 2758)

C. Iтoн & Co. (America) Inc. *v.* United States

United States Customs Court, Third Division

(Decided September 8, 1966)

*Stein & Shostak* for the plaintiff.

*John W. Douglas*, Assistant Attorney General, for the defendant.

Before Donlon, Richardson, and Landis, Judges